IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

NA'AHINEE HOYETT,            )
                             )
    Plaintiff,               )
                             )
v.                           )            CASE NO. 3:15-cv-344-GMB
                             )
CAROLYN W. COLVIN,           )
Acting Commissioner of Social Security,   )
                             )
    Defendant                )

## MEMORANDUM OPINION AND ORDER

On February 16, 2012, Plaintiff Na'Ahinee Hoyett ("Hoyett") applied for supplemental security income benefits under Title XVI of the Social Security Act. 42 U.S.C. § 1381, *et seq*. She alleges a disability onset date of November 9, 2011.[1] Hoyett's claims were denied at the initial administrative level. Hoyett then requested and received a hearing before an Administrative Law Judge ("ALJ"). On May 1, 2013, the ALJ held a hearing and, on July 15, 2013, denied Hoyett's claims. Hoyett requested a review of the ALJ's decision by the Appeals Council ("AC"), which the AC denied on March 23, 2015. Thus, on that date, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner").

The case is now before the court for review in accordance with 42 U.S.C. §§ 405(g) and 1383(c)(3). Pursuant to 28 U.S.C. § 636(c)(1) and Rule 73.1 of the Local Rules for the United States District Court Middle District of Alabama, the parties have

---

[1] Hoyett was granted permission to amend the alleged onset date from October 6, 2011 to the date of the filing of her application for benefits, November 9, 2011. R. 21, 49, 163.

consented to have the undersigned United States Magistrate Judge conduct all proceedings in this case and enter a final judgment. Based on the court's review of the record and the relevant law, the court finds that the decision of the Commissioner is due to be affirmed.

## I.  STANDARD OF REVIEW

The court reviews a social security case to determine whether the Commissioner's decision "is supported by substantial evidence and based upon proper legal standards." *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]," but rather it "must defer to the Commissioner's decision if it is supported by substantial evidence." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (quotation marks omitted) (first alteration added).

"Substantial evidence is defined as more than a scintilla, i.e., evidence that must do more than create a suspicion of the existence of the fact to be established, and such relevant evidence as a reasonable person would accept as adequate to support the conclusion." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citations omitted). The court must scrutinize the entire record to determine the reasonableness of the decision reached, "taking into account evidence favorable as well as unfavorable to the decision." *Id.* (citation omitted); *see Hale v. Bowen*, 831 F.2d 1007, 1010 (11th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if it would have reached a contrary result as a finder of fact, and even if it finds "that the evidence preponderates against the" Commissioner's decision.

*Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (citation omitted). The court will reverse the Commissioner's decision if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citations omitted). There is no presumption that the Commissioner's conclusions of law are valid. *Id.*

## II.  STATUTORY AND REGULATORY FRAMEWORK

To qualify for supplemental security income benefits, a claimant must show that he or she is indigent and disabled, that is, "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A). A "physical or mental impairment" is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). The claimant bears the burden of proving that he or she is disabled, and the claimant is responsible for producing evidence to support the claim. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

A determination of disability under the Social Security Act requires a five-step analysis. *See* 20 C.F.R. § 416.920. Specifically, the Commissioner must determine in sequence:

(1) Is the claimant presently unemployed?
(2) Is the claimant's impairment severe?

(3)  Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

(4)  Is the claimant unable to perform his or her former occupation?

(5)  Is the claimant unable to perform any other work within the economy?

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986) (footnote omitted).[2]   The burden of proof rests on a claimant through Step 4. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237–39 (11th Cir. 2004).   The claimant establishes a prima facie case of qualifying for disability once he or she meets the burden of proof from Step 1 through Step 4.  At Step 5, the burden shifts to the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. *Id.*

To perform Step 4 and Step 5, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). *Id.* at 1238–39.  The RFC is what the claimant is still able to do despite his or impairments and is based on all relevant medical and other evidence. *Id.*  It also can contain both exertional and nonexertional limitations. *Id.* at 1242–43.  At Step 5, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. *Id.* at 1239.   To do this, the ALJ may either use the Medical Vocational Guidelines ("grids")[3] or hear testimony from a vocational expert ("VE"). *Id.* at 1239–40.  The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience.   Each factor can independently limit the number of jobs realistically available to an individual.

---

[2] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986), is a supplemental security income case ("SSI"). The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981).

[3]  20 C.F.R. pt. 404 subpt. P, app. 2.

*Id.* at 1240.   Combinations of these factors yield a statutorily-required finding of "disabled" or "not disabled." *Id.*

### III.  DISCUSSION

#### A.     Background

Hoyett was 27 years old at the time of the ALJ's decision. R. 40, 140.  She earned a high school occupational diploma and had no relevant work history R. 51.  Following an administrative hearing, the ALJ found at Step 1 that Hoyett had not engaged in substantial gainful activity since the application and alleged onset date, November 9, 2011. R. 23.  At Step 2, the ALJ determined that Hoyett suffers from the following severe impairments: "status post gunshot wound to the right hand, with closed reduction and internal fixation, plate and pins; posttraumatic stress disorder (hereafter 'PTSD'); general anxiety disorder; depression; borderline intellectual functioning vs. mental retardation; and a history of alcohol abuse." R. 23.  At step three, the ALJ found that Hoyett "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments . . . ." R. 24.  The ALJ then determined Hoyett's residual functional capacity, stating that "[a]fter careful consideration of the entire record, the undersigned finds that, considering all of the claimant's impairments, she retains the functional capacity to perform a *reduced* range of light work," and also listing a number of nonexertional limitations for Hoyett. R. 28.  Next, at step four, the ALJ found Hoyett had no past relevant work. R. 40.  At step five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that she could perform, including as a fast food worker, injection machine tender, or presser. R. 41.  Thus, the ALJ concluded

that Hoyett was not disabled within the meaning of the Social Security Act from November 9, 2011, the date the application was filed, through the date of the ALJ's decision, July 15, 2013, and denied her claims. R. 42.  Hoyett requested a review of the ALJ's decision by the AC, which denied her request for review. Tr. 1–6.  This action followed.

**B.    Issues Presented**

Hoyett presents two issues for the court's review:

1.    The Commissioner's decision should be reversed because the ALJ failed to apply the correct legal standards in evaluating Ms. Hoyett's Intellectual Disability.

2.    The Commissioner's decision should be reversed, because the ALJ failed to fulfill his duty to develop the record regarding Ms. Hoyett's Intellectual Disability.

Doc. 12, at 4.  Hoyett relies on Listing 12.05(C), Intellectual Disability.[4] Doc. No. 12, at 4; *see* 20 C.F.R. Pt. 220, Subpart P, Appendix 1.

**C.    Analysis**

Listing 12.05 provides, in pertinent part, that a claimant is disabled if she meets the following criteria:

§ 12.05.  *Intellectual disability.*  Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied. . . .

---

[4] "The 2013 version of the Listing of Impairments replaced the term 'Mental Retardation' with 'Intellectual Disability.'" *T.R.C. ex rel. Boyd v. Comm'r, Soc. Sec. Admin.*, 553 F. App'x 914, 919 n.2 (11th Cir. 2014).

C.  A valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function.

*See* 20 C.F.R. Pt. 220, App. 1, Listing 12.05(C).[5]

A valid, qualifying IQ score creates a rebuttable presumption that a claimant manifested deficits in adaptive functioning prior to age 22, but the Commissioner may rebut the presumption with evidence of daily activities that are inconsistent with a diagnosis of intellectual disability. *Hodges v. Barnhart*, 276 F.3d 1265, 1269 (11th Cir. 2001) (relating to IQ evidence after age 22); *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (relating to IQ evidence before age 22); *see James v. Com'r of the Soc. Sec. Admin.*, No. 15-11984, 2016 WL 3923826, at *2 (11th Cir. July 21, 2016) (citing *Hodges* and *Lowery*, and holding that the Commissioner rebutted the presumption by presenting substantial evidence that the claimant's daily activities and behavior showed no adaptive deficit); *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986) (holding that a valid IQ score can be disregarded if it is inconsistent with other evidence in the record of the claimant's daily activities and behavior).  The presumption is an acknowledgment that, "absent evidence of sudden trauma," a person's IQ remains fairly constant throughout life. *Hodges*, 276 F.3d at 1268.  However, the regulations also recognize that test results do not tend to stabilize until a person reaches the age of 16, and assessments of younger

---

[5] "The standard for an 'additional and significant' limitation is the same as for a 'severe' impairment under 20 C.F.R. 404.1520(c) or 416.920(c)." *Carroll v. Astrue*, 2009 WL 1708073, at *1 & n.2 (M.D. Ala. June 17, 2009) (noting the interpretation in *Edwards by Edwards v. Heckler*, 755 F.2d 1513, 1517 (11th Cir. 1985), has been superseded by regulation); *see also Willard v. Colvin*, 2014 WL 1664300, at *4–5 (N.D. Ala. Apr. 25, 2014) (same); *but see Hethcox v. Comm'r of Soc. Sec.*, 638 F. App'x 833, 836 (11th Cir. 2015) (relying on *Edwards*).

children remain valid for shorter time periods. *See* 20 C.F.R. Part 404, Subpart P, App'x 1, Part B, § 112.00(D)(10) ("IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above"); *Stutts v. Astrue*, 489 F. Supp.2d 1291, 1293 (N.D. Ala. 2007) (noting that courts use the children's regulations in determining mental impairments for adults).

### 1.    *IQ Testing*

Hoyett argues her educational records show that she had significantly subaverage general intellectual functioning with deficits in adaptive behavior manifested prior to age 22. *See* Doc. 12 at 8.  In 1994, when she was 10, she was administered a Wechsler Intelligence Scale for Children ("WISC") IQ test, and she received a verbal score of 69, a performance score of 70, and a full scale score of 69 +/-5. R. 182.  These scores indicated Hoyett was "functioning in the Mild Mentally Retarded Level of intellectual development," R. 184, and she was deemed eligible for special education services, which she received from third grade through twelfth grade, culminating in an occupational diploma. R. 51 & 187–88.  Hoyett argues that the ALJ erred in not applying a legal presumption, based on her 1994 IQ test, that "'mental retardation is a condition that remains constant throughout life.'" Doc. 12 at 8 (quoting *Burgans v. Astrue*, 2010 WL 1254299, at *4 (M.D. Ala. Mar. 26, 2010)).

The ALJ ruled that the evidence of Hoyett's IQ was invalid because it was too old. R. 27.  In doing so, the ALJ made no error of law, and Hoyett's reliance on *Burgans* is misplaced.  The presumption applies only for valid tests, and Hoyett cannot rely on the presumption because her 1994 IQ test was too remote in time under the regulations. *See*

8

*Hodges*, 276 F.3d at 1269 ("This circuit implicitly recognized that a claimant meets the criteria for presumptive disability under Listing 12.05(C) when the claimant presents a *valid* I.Q. score of 60 to 70") (emphasis added); 20 CFR Part 404, Subpt. P, App 1, ¶ 12.00(D)(10).

Hoyett argues that the ALJ failed to credit Hoyett's more recent, "SB-FE"[6] intelligence test in April 24, 2001, on which she scored a 63. Doc. 12 at 8–9; R. 187. The ALJ, however, had no basis in the record to compare the SB-FE and the WISC test scores in any meaningful way. *See Lowery*, 979 F.2d at 839 ("Although the WISC and PPVT I.Q. scores appear to support the ALJ's finding on the lifelong retardation issue, the ALJ had absolutely no basis in the record for a meaningful comparison of the WISC, PPVT and WAIS–R scores) (citing ¶ 12.00(D) of the listing); 20 CFR Part 404, Subpt. P, App 1, ¶ 12.00(D)(9) ("The IQ scores in listing 112.05 reflect values from tests of general intelligence that have a mean of 100 and a standard deviation of 15, e.g., the Wechsler series. IQs obtained from standardized tests that deviate significantly from a mean of 100 and standard deviation of 15 require conversion to a percentile rank so that the actual degree of limitation reflected by the IQ scores can be determined."); *Walker v. Colvin*, 2013 WL 4496338, at *8 n.8 (M.D. Ala. Aug. 22, 2013) (discussing *Lowery* and the regulations). Consequently, Hoyett cannot rely on her intelligence tests to establish that she meets the Listing.

Hoyett next argues the ALJ erred in not further developing the record regarding

---

[6] Counsel for Hoyett avers that these initials refer to the Stanford-Binet Intelligence Scale: Fourth Edition. Doc. 12, at 9 n.4.

her intellectual functioning. Doc. 12 at 10.  She argues the ALJ should have ordered an updated IQ test, pointing to the statement of the consultative psychologist, Dr. Storjohann, that "[a]dditional assessment with a WAIS-IV is needed to determine her current level of intellectual functioning more precisely." Doc. 9 at 10–11; R. 293.  Hoyett relies on the decision in *Stutts*, wherein the district court remanded for an IQ assessment after the record showed "poor academic development of skills and with a low, borderline intellect," the claimant had an invalid childhood IQ of 60, an additional physical impairment satisfying Listing 12.05(C), "and the absence of evidence suggesting the plaintiff did not meet the diagnostic criteria for mild mental retardation." *Stutts*, 489 F. Supp. 2d at 1294–95.  The Commissioner responds that no remand for IQ testing is necessary because, regardless of her IQ score, the record demonstrates Hoyett does not have deficits in adaptive functioning, as required by the introductory paragraph of Listing 12.05. Doc. 15 at 10; *see Hodges*, 276 F.3d at 1269 (holding that a claimant's activities of daily life may rebut presumption of mental impairment based on IQ test); *Lowery*, 979 F.2d at 837 ("[A] valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior.").  As explained in the following section, the undersigned finds that no remand is required.

### 2.  *Deficits in Adaptive Functioning*

The introductory paragraph in Listing 12.05 requires that "a claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior, and (3) have manifested deficits in adaptive behavior before age 22."

*Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997).[7]   The ALJ here found that "the evidence does not support a finding of deficits in adaptive functioning," and there was a "general absence of adaptive deficits." R. 27 & 37.   Elsewhere in the decision, however, the ALJ stated that the record "demonstrates no significant deficits in adaptive capacity," R. 39, and relied heavily on the State agency consultant's opinion that Hoyett did not have significant deficits in her adaptive functioning. R. 27, 33, 76.

Hoyett argues the ALJ erred by requiring her to prove significant deficits in adaptive functioning, and the ALJ's reliance on the State agency consultant's opinion that Hoyett did not currently have "significant deficits in adaptive functioning" was misplaced. Doc. 12 at 9.   The plain language of the listing requires "deficits in adaptive functioning," not *significant* deficits in adaptive functioning, and there is district-court authority supporting Hoyett's position. *See, e.g.*, *Butts v. Colvin*, 2014 WL 1245874, at *4 (M.D. Ala. Mar. 24, 2014); *Jones v. Colvin*, 2013 WL 842704, at *4 (M.D. Ala. Mar. 6, 2013) ("The Commissioner here, as well as in other cases, seems to conflate the test for a diagnosis of mental retardation under the DSM and a finding that Listing 12.05(C) has been met.   The DSM requires 'significant deficits' in adaptive behavior.   Whereas, the introductory paragraph of 12.05 simply requires 'deficits.'   The severity question comes into play in sections (A)–(D), with elements of adaptive behavior dealt with in (A) and (D)."); *Southard v. Colvin*, 2015 WL 1186153, at *5 n.2 (N.D. Ala. Mar. 16, 2015) (contrasting Listing 12.05 with DSM-IV-TR, which "requires an even higher standard (*i.e.* "*significant* deficits or impairments in adaptive functioning")); *Monroe v. Astrue*, 726

---

[7] The language of Listing 12.05 now refers to adaptive "functioning," not "behavior."

F. Supp. 2d 1349, 1355 (N.D. Fla. 2010) ("The caselaw addressing the 'adaptive functioning' aspect of Listing 12.05C suggests that the adaptive functioning must be significantly inconsistent with the I.Q. score.  An ability to do simple daily activities and simple jobs is not enough."); *Flores v. Colvin*, 2016 WL 1162698, at *5 n.8 (E.D. Cal. Mar. 24, 2016).  In *Flores*, the court rejected the notion that a claimant must show significant deficits, noting that in 2010 the Social Security Administration proposed requiring "significant" deficits because doing so "'is generally consistent with the diagnostic criteria used in the clinical community,'" but the current regulations do not include the language. *Flores*, 2016 WL 1162698, at *5 n.8 (quoting 75 Fed. Reg. 51336, 51339 (Proposed Rules of the Social Security Administration/Revised Medical Criteria for Evaluating Mental Disorders)).

Recently, however, in an unpublished and nonbinding opinion, the Court of Appeals for the Eleventh Circuit used language suggesting that a claimant is required to show significant deficits, stating, "[s]ubstantial evidence supports a finding that Hunt suffered no *significant* deficits—as required under the first part of Listing 12.05(C)—in adaptive functioning." *Hunt v. Soc. Sec. Admin., Com'r*, 631 F. App'x 813, 816 (11th Cir. 2015) (emphasis added).  There is no definition of adaptive functioning in Listing 12.05, but the applicable regulations permit an ALJ to use "any of the measurement methods recognized and endorsed by the professional organizations" to satisfy the elements of Listing 12.05. 67 Fed. Reg. 20018, 20022.  Although adaptive functioning is not defined in the regulations, the Eleventh Circuit has favorably cited the description of adaptive functioning in the Social Security Administration's Program Operations Manual System

("POMS") as "'the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age,'" as well as the statement in the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders that adaptive functioning means "'how well a person meets standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical.'" *Schrader v. Acting Com'r of the Soc. Sec. Admin.*, 632 F. App'x 572, 576 & n.3–4 (11th Cir. 2015) (quoting Soc. Sec. Admin., Program Operations Manual System, DI 24515.056(D)(2) (2012), *available at* https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515056 (last accessed July 28, 2016); and DSM-V 37 (5th ed. 2013)); *see also id.* at *576 (explaining that "POMS is an administrative interpretation, which, although not the product of formal rulemaking, has been promulgated by the Social Security Administration as publicly available operating instructions for processing Social Security claims") (quotation marks and citation omitted); *James*, 2016 WL 3923826 at *2 n.2 (quoting DSM-IV-TR for the proposition that adaptive functioning "'refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociological background, and community setting'").

After giving careful consideration to these authorities, the court concludes that the ALJ's decision must be upheld because substantial evidence supports the determination that Hoyett did not have deficits in adaptive functioning under Listing 12.05. First, the

court is not convinced the ALJ required Hoyett to show significant deficits in adaptive functioning.  The references were made in the context of the findings of the State agency reviewer, R. 27 & 33, and all but one of the ALJ's other references to adaptive functioning did not include the word "significant." R. 26, 27, 37, 39.  Second, substantial evidence in the record supports the ALJ's finding that Hoyett lacked deficits in adaptive functioning, as shown by her daily activities and behavior.  The ALJ explained:

> Her alleged mental condition has no effect on her ability to care for her personal needs (Exhibit 4E).   Based on her own reports, she has independent living skills, doing laundry, vacuuming, and other household chores; cooking and preparing her own meals; obtaining a drivers [sic] license and driving; paying bills and handling money; reading and learning; following written instructions; handling gradual changes in routine; grocery shopping; listening to music; surfing the web; talking and texting on her cell phone spending time with family members; spending time with a female friend; eating out; and spending time with a boyfriend she was seeing several times a week (Exhibits 4E and 6F).  During a consultative examination in February 2013, the claimant reported that she was able to handle activities of daily living without any help.  It is also noted that [sic] was his opinion that the claimant would be able to handle the activities of daily living without any help "and is currently doing so."

R. 27.  The ALJ then determined that Hoyett did not have an impairment under Listing 12.05(C).  The ALJ elaborated:

> Support for the above conclusions has been derived from the opinions of the State Agency consulting psychiatrist, Robert Estock, M.D., as set forth in his responses (and narrative explanations) to a Psychiatric Review Technique assessment (Exhibit 1A).   Although Dr. Estock noted the historic mild mental retardation scores, he stated that the impairment did not precisely satisfy the diagnostic criteria.   While he was under the impression that the impairment could be classified as "severe" (as defined by the regulations), it was also his opinion that it did not, either singly or in combination, meet or medically equal the 12.05 listing, *placing emphasis on the absence of significant deficits in adaptive functioning. . . .*

R. 27 (emphasis added).  The ALJ stated that Dr. Estock relied on Hoyett's own reports to find she "does not currently have any significant deficits in adaptive functioning." R. 33, 76, 167–73.  The ALJ stated that Dr. Estock's "suggestion of mild mental retardation is flawed, being based in the 1994 testing," but there was no substantial evidence to discredit Dr. Estock's ultimate findings. R. 34.   The ALJ gave "great weight" to Dr. Estock's conclusions, R. 34, and explained:

> [Dr. Estock's] conclusions are generally consistent with the subsequent conclusions of psychologist Robert Storjohann following a consultative examination in October 2012 with one exception.  Dr. Storjohann suggested mild to moderate limitations in social functioning. In taking a view of the evidence most favorable to the claimant, the undersigned has found a moderate restriction in social functioning.

R. 28.

The ALJ found Hoyett not credible in her description of the many emotional difficulties she reported to Dr. Storjohann, and Hoyett does not challenge that finding. R. 35-36.  Hoyett told Dr. Storjohann that she was a slow learner in school, that she was in special education from fourth through twelfth grade, and that she graduated with an occupational diploma. R. 35.   The ALJ described Dr. Storjohann's assessment, emphasizing Hoyett's ability to do math and Dr. Storjohann's estimation that her mental functioning was higher than "mental retardation," and perhaps even higher than "borderline intellectual functioning":

> Although she was unable to identify the Governor of Alabama or state the number of weeks in a year, she was able to perform (undescribed) simple mathematical calculations, spelled the word "world" backward and forward, recalled three of three objects after delay, recalled five digits forward and 4 digits backward, *was able to count backwards from 20 without error, and was able to subtract serial 7s f[ro]m 100 without error.*

> According to Dr. Storjohann, the claimant's *remote and recent memory was intact*; her abstraction was intact; her thought processes were logical, coherent, and goal directed without loose associations or confusion; and her thought content was normal.  The claimant's judgment and insight were commensurate with her level of intellectual functioning and the psychologist suggested that she had the ability to manage her own financial affairs and make simple work decisions.  Based on the examination, Dr. Storjohann estimated the claimant's intellectual functioning to be in the borderline range.  He did not suggest, nor did the performance on the mental status examination remotely indicate, mental retardation.  In fact, he apparently felt that her intellectual functioning was not [sic] higher, including "'*rule out*' borderline intellectual functioning" as his DSM-IV, Axis II impression.

R. 36, 292–93.  Dr. Storjohann stated, "[h]er level of intellectual functioning is estimated to fall in the borderline range. Additional assessment with a WAIS-IV is needed to determine her current level of intellectual functioning more precisely." R. 293.  In his Medical Source Statement, Dr. Storjohann stated that Hoyett has mild deficits in understanding, remembering, and carrying out simple instructions, and mild deficits in the ability to make judgments and simple work-related decisions.  He stated that Hoyett has moderate deficits in her ability to understand, remember, and carry out complex instructions and in her ability to respond appropriately to supervisors, coworkers, and work pressures. R. 294-95.  The ALJ stated that "by taking a view of the evidence most favorable to the claimant, the undersigned will find that the claimant cannot understand, remember, and carry out complex instructions and cannot make judgments in complex work-related decisions," even though Dr. Storjohann found Hoyett had only moderate limitations in those areas. R. 37.

Other courts considering circumstances similar to Hoyett's have found insufficient evidence of the required deficits in adaptive functioning.  For example, a claimant who

could "cook simple meals, do household chores, drive a car by herself, take care of a dog, babysit children, and work part-time at McDonald's" lacked sufficient deficits in adaptive functioning. *Prunty v. Acting Com'r of Soc. Sec. Admin.*, 635 F. App'x 757, 759 (11th Cir. 2015).  Similarly, a claimant who attended special education classes but graduated from high school, who could work part-time at a nursery, drive herself to work, prepare simple meals, dress and groom herself, attend church regularly, and socialize with friends also lacked deficits in functioning required to meet Listing 12.05. *Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 984 (11th Cir. 2013); *Outlaw v. Barnhart*, 197 F. App'x 825, 827 (11th Cir. 2006) (noting claimant "had worked for several years as an adult as a van driver, a security guard, and in the shipping and receiving department at a pecan plant").

Hoyett does not have a history of semi-skilled work like that of a number of claimants who were determined not to have deficits in adaptive functioning. *E.g.*, *James*, 2016 WL 3923826, at *2 (noting 15 years of semi-skilled work, including supervising employees at Pizza Hut, preparing reports and bank deposits); *Rodriguez v. Comm'r of Soc. Sec.*, 633 F. App'x 770, 774 (11th Cir. 2015) (noting a "work history [that] included jobs at the skilled and semi-skilled level . . . for many years"); *Schrader v. Acting Com'r of the Soc. Sec. Admin.*, 632 F. App'x 572, 577 (11th Cir. 2015) (noting part-time work at laundromat, claimant testified she could do the work of a ticket taker, and she applied for jobs at the grocery store and fast food restaurants in her town, but none were hiring; claimant took special education classes but graduated with a regular high school diploma, could groom herself, cook simple meals, do household chores, drive, watch television,

17

babysit her nephews without assistance, use a debit card, and deposit money into her checking account); *O'Neal v. Comm'r of Soc. Sec.*, 614 F. App'x 456, 459-60 (11th Cir. 2015) (noting that claimant held a "job as a dishwasher for many years without receiving any special accommodation or training. He quit his job only for family reasons. Afterward, he worked occasionally as a handy man, helping with carpet and trim work and installing siding. . . . helps at home with light yard work, looks after his two children, independently performs all his activities of personal care and daily living, and attends church every Sunday. He holds a driver's license and drives locally three times per week"); *Popp*, 779 F.2d at 1499-50 (noting that claimant was "close to completing the requirements for a bachelor of science degree and had a history of having taught high school algebra," as well as umpiring softball games).  Hoyett argues that her lack of relevant work experience shows deficits in her ability to sustain employment. Doc. 12 at 9.  But the reason she gives for leaving her job at McDonald's after about a month was not that she could not do any of the tasks.  Instead, she said, "I just I, I honestly didn't care about it because I'm not too much of a people person, and I couldn't do the job so well.  The only part I could do good about that job was cleaning, that was it.  And I just—it wasn't down my alley." R. 53.  Hoyett testified she babysat sporadically over a couple of years for three children, twins who were under a year old and a five-year-old. R. 52. In her Disability Report, she stated that the condition that prevents her from working began on October 6, 2011, about the time she sustained a gunshot wound to her dominant hand. R. 31 & 168.  Her answers in the Function Report—which, the ALJ observed, she handwrote herself—focus much more on her injured hand than any intellectual deficits.

R. 31, 199–206.  For example, Hoyett stated that she could not handle a savings account or use a checkbook because she "can't sign my name or write as well." R. 202–03.  Her comment is consistent with the finding of Dr. Storjohann that she could perform simple mathematical calculations, including subtracting serial 7s from 100 without error. R. 292.  Based on his assessment, Dr. Storjohann estimated Hoyett had borderline intellectual functioning. R. 293.  The only specific reference to an intellectual disability in the Function Report is her self-reported "education history of special classes," and her "main problem" of "slow speech + memory.  I can learn but I'll forget certain things once I'm not around it.  I have to be refreshed on things." R. 206.  These facts, as well as the record as a whole, provide substantial evidence for the ALJ's conclusion that, despite her historically low IQ score and special education, Hoyett did not have the functional limitations required to meet the criteria in the introductory paragraph of Listing 12.05.  *See Miles*, 84 F.3d at 1400 (holding that courts must "defer to the Commissioner's decision if it is supported by substantial evidence").

## IV.  CONCLUSION

Based on the foregoing, it is ORDERED that the decision of the Commissioner denying benefits is AFFIRMED. A final judgment consistent with this Memorandum Opinion and Order will be entered separately.

DONE this 15th day of September, 2016.

/s/ Gray M. Borden
UNITED STATES MAGISTRATE JUDGE

19